IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MARGARET OERTEL, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 2:21-cv-00774 |
| CITY OF RACINE, WISCONSIN, | ) ) ) |
| Defendant. | ) ) |

## COMPLAINT

Plaintiff, Margaret Oertel, for her Complaint against the City of Racine in the State of Wisconsin, alleges as follows:

### JURISDICTION AND VENUE

1. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of rights under the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), and the Americans With Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA").

2. Pursuant to 28 U.S.C. § 1391(b), 42 U.S.C. § 2000e-5(f)(3), and 29 U.S.C. § 2618(a)(2), venue is proper in this district because a substantial part of the events and omissions giving rise to this action, including the unlawful practices alleged herein, occurred in this district.

1

## PARTIES

3. Plaintiff Margaret Oertel is a resident of the State of Wisconsin and worked for Defendant City of Racine ("Racine") in the State of Wisconsin from October 1, 2014 to November 1, 2020. At all relevant times, Oertel was an "employee" of Racine under all relevant statutes.

4. Defendant Racine is a municipality located in the County of Racine in the State of Wisconsin, with its City Hall located at 730 Washington Avenue, Racine, Wisconsin 53403. At all relevant times, Racine was an "employer" within the meaning of all relevant statutes.

## ADMINISTRATIVE PREREQUISITES

5. On November 2, 2020, Oertel filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the Equal Rights Division of the Wisconsin Department of Workforce Development, alleging discrimination and retaliation under ADA.

6. On June 9, 2021, the U.S. Department of Justice issued a Notice of Right to Sue.

7. All prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

**I.   Oertel's Medical Condition and Use of FMLA Leave**

8. In December 2014, Oertel had a biopsy that revealed she had developed abnormal, precancerous cells in her left breast, a condition called atypical hyperplasia.

9. In January 2015, Oertel was required to have atypical ductal hyperplasia excised from her left breast (i.e., lumpectomy), a surgical procedure.

10. Thereafter, Oertel was required to undergo regular imaging (mammograms and MRIs) and clinical examinations of both of her breasts, about every six months.

11. In 2017, 2018, and 2019, Oertel requested and was approved by Racine to take intermittent FMLA leave for her breast examinations and imaging.

12. In January 2020, Oertel underwent imaging that revealed she had multiple new masses of abnormal breast cells in both of her breasts, placing her at high risk of breast cancer.

13. Rather than more excision of the abnormal, precancerous cells, Oertel's surgeon recommended that Oertel undergo a double mastectomy (i.e., removal of all breast issue). The procedure was scheduled for May 29, 2020, delayed in part due to the global COVID-19 pandemic.

14. On May 20, Oertel applied for medical leave under the FMLA from May 29, 2020 through July 19, 2020, for her double mastectomy surgery and an anticipated seven-week recovery period. The same day, Racine provided Oertel with written notice that her request for FMLA leave had been approved.

15. Oertel's manager, Support Services Manager Julia Jones, was aware of Ms. Oertel's breast cell condition beginning in January 2015, when Oertel told her about her lumpectomy. In February 2020, Oertel notified Jones of her need for a double mastectomy.

## II. Oertel's Management Challenges

16. Oertel was the Customer Service Manager for Racine's Police Department. She was responsible for overseeing operation of the Public Service Counter and Record Bureau for the Police Department and managed approximately 10-15 employees at any given time.

17. Oertel took over management of the customer service team from Jones in October 2014. It was a difficult group of employees to manage. Before the passage of Wisconsin Act 10 in 2011 which limited public sector union bargaining rights, the employees had union representation that routinely contested disciplinary action and that culture of challenging accountability and managerial authority persisted during Oertel's tenure.

18. Oertel tried to hold her employees accountable when they failed to satisfy their responsibilities and follow rules, but she did not have sufficient support from Jones.

19. For example, Oertel twice found significant sums of cash missing in an employee's drawer and recommended discipline, but Jones told her not to issue discipline.

20. When Oertel tried to assert management control, her employees made false accusations and complaints about her (e.g., that she was "mean" and "unapproachable").

21. Jones also allowed Oertel's employees to bring their questions and concerns directly to her rather than follow their chain of command, which undermined Oertel's authority as their manager.

### III. Events Leading to Oertel's First Termination

22. On January 15, 2020, after more than five years in her position, Jones placed Oertel on a performance improvement plan ("PIP") which states, "Performance Improvement Period: January, 2020 to May, 2020."

23. Under "Employee Responsibilities," the PIP listed a litany of responsibilities from her Oertel's work schedule (e.g., "[m]ust also be reached during off scheduled hours when not on vacation or when sick") to "[c]omply with all other City of Racine; Police Department policies, procedures, and rules." Most of the responsibilities are broad, subjective statements without any specific action items or any indication as to how Oertel's improvement would be objectively measured.

24. The PIP also states that "[p]erformance will be reviewed on a weekly basis; every Monday by 3:00pm to discuss prior week," and that "[r]eview will be documented in a performance improvement report completed by the Supervisor."

4

25. Racine did not comply with the PIP's weekly review process. Oertel first received a weekly progress report from Jones on April 6, 2020, after Jones became aware of Oertel's worsening breast condition and need for a double mastectomy.

26. The weekly progress reports after April 6 show, and Jones acknowledged, that Oertel had made significant improvement.

27. By May 4, 2020 – just four weeks after the first April 6 report – Jones noted in her weekly report that Oertel had progressed in *all* areas of the PIP and Jones's comments were all complimentary.

28. In her May 20, 2020 weekly report, Jones noted that Oertel had continued to make progress except in one area: "Monitor your own personal behaviors and conversations with other [sic]; including those you manage." For "Progress," Jones wrote, "Needs additional monitoring. Work on relationship building with those you supervise." For "Managers [sic] Notes," Jones offered no detail or explanation as to how Oertel had not met the expectation or what Oertel was expected to do to meet it. Jones acknowledged, "Some complaints made but do not seem to be valid," and merely added general guidance: "Be careful about giving the perception that you are engaging in gossip with your staff about their coworkers. Remain neutral and be careful about making negative comments."

29. With respect to the same area in Jones's May 4 report, which Jones delivered to Oertel on May 20 with Jones's May 20 report, Jones wrote, "You have seem [sic] to have found the boundaries between friendship and supervisor with your staff." Jones noted nothing in her May 20 report that had occurred or changed in Oertel's conduct between May 4 and May 20 regarding Oertel's behavior monitoring.

5

30. Late in the afternoon of May 28, 2020 – the day before Oertel's scheduled surgery and her approved FMLA leave was to begin – Jones brought Oertel to a meeting with Kate Croteau, Racine's new (as of May 18, 2020) Director of Human Resources. Croteau told Oertel that her employment was being terminated because she was "not a good fit" for her position.

31. Croteau also told Oertel that she could resign to avoid termination and gave Oertel a Resignation Agreement. Croteau informed Oertel that if she did not sign the Resignation Agreement, her employment would be terminated and she would lose her health insurance coverage. Oertel felt threatened and coerced by the loss of her health insurance coverage given her breast condition and need for surgery and post-surgery care.

32. Consistent with what Croteau told Oertel, the Resignation Agreement states: "The City recognizes that this is a resignation in lieu of termination and will not contest any claim by Ms. Oertel for Unemployment Compensation."

33. After that sentence, the Resignation Agreement states: "The parties acknowledge that Ms. Oertel has a period of Family and Medical Leave (FMLA) leave commencing May 29, 2020. Ms. Oertel will remain on such FMLA leave through her separation date."

34. The Resignation Agreement requires Oertel to release all claims she had against Racine. The Agreement does not specify any consideration (i.e., anything of value to which Ms. Oertel was not entitled) offered to Oertel in exchange for her signing the Agreement and releasing her claims.

35. After Croteau told Oertel that her employment was ending, Jones walked with Oertel back to Oertel's work station, where Jones observed Oertel pack up her personal belongings, requested Oertel's keys and ID badge, and escorted Oertel out of the office.

6

36. Oertel understood she would not be returning to work at the City and her coworkers told Oertel that they were told she would not be coming back.

37. After receiving notice of her termination, Oertel requested copies of her employment records under Wisconsin's Personnel Records Act, Wis. Stat. § 103.13.

38. Oertel's employment records contain an undated memo from Jones to the "Human Resources Department," in which Jones stated that "[t]hroughout the PIP process, Margaret showed steady improvement," but that Jones was "reluctant to believe that the improvement is permanent, and are [sic] temporary because of the PIP process." Jones concluded with the words used by Croteau: "It is my opinion that even with additional training and guidance that Margaret Oertel is not a good fit for the Customer Service Manager position for the Racine Police Department."

## IV. Events Leading to Oertel's Second Termination

39. On June 18, 2020, Oertel's legal counsel notified Racine in writing that Oertel's abrupt firing violated Oertel's rights under the federal FMLA and the ADA, in addition to Wisconsin law. Oertel's legal counsel also informed Racine that the Resignation Agreement offered no valid consideration for Oertel's release of her claims against the City.

40. Racine thereafter reversed its termination decision.

41. On June 26, 2020, the Racine's Assistant City Attorney, Marissa Roubik, sent Oertel's legal counsel an email which states: "Ms. Oertel's employment has not been terminated. Since May 29, 2020, Ms. Oertel has been and will remain on FMLA leave until her expected return to work date on July 20, 2020, unless Ms. Oertel notifies the City otherwise." Roubik reiterated that same position in an email to Oertel's counsel on July 2, 2020.

42. On July 8, 13, and 14, Oertel's legal counsel sent emails to Roubik requesting information regarding Oertel's return to work, including the status of the PIP, and what Oertel's employees (who were told Oertel was not coming back to work) would be told about her return to work. Neither Roubik, Croteau, nor any other Racine official ever responded to those requests for information.

43. Due to complications from her surgery, Oertel needed to extend her FMLA leave, which the City approved.

44. On August 20, 2020, Oertel's physician cleared her to return to work and he faxed a release to Racine.

45. Racine did not allow Oertel to return to work, however. While Oertel was on leave and recovering from the physical and emotional toll of her double mastectomy, Racine had been concocting other grounds to fire her.

46. Shortly after Oertel's doctor faxed to Racine Oertel's release to return to work, Oertel received a voice message from Croteau telling Oertel to read her email.

47. Oertel checked her email as directed and found an email from Croteau sent on August 20, 2020 at 12:32 p.m. Attached to the email was a letter from Croteau stating, "This letter is being sent to notify you that it is the City of Racine's intent to terminate your at-will employment as a Customer Service Manager with the City of Racing Police Department."

48. As grounds for the termination, Croteau's letter states:

> Over the course of the PIP, you showed steady improvement in some of these areas, however, you did not make consistent progress with each of the stated goals and performance expectations. As such, you have not met all of the PIP's performance expectations, which you needed to achieve by the end of May 2020. This alone is grounds for discharge.
>
> However, a matter of great concern came to light during the last weeks of May 2020 that constitutes a terminable offense in and of itself.

8

49. The new matter was purportedly Oertel's use of a "generic" birthdate (i.e., 01/01/1900) to process background check requests for license applications (e.g., serving liquor at events).

50. Racine's City Clerks – who are in a different department of the City than the Police Department – are responsible for license applications and providing birthdates for background checks as part of the license application process. According to the City's website, the City Clerk & Treasurer's Office "is responsible for the issuance of approximately 50 different types of licenses."

51. The City's license applications require the applicants to provide birthdates.

52. During the relevant time period, the Department of Justice required a birthdate to run a background check search through its database.

53. Tara Coolidge (f/k/a Tara McMenamin) is the City Clerk and Treasury Manager and oversees the Office's staff.

54. The City Clerk & Treasurer's Office used the Racine Police Department to run background checks for license applicants, but the City Clerks are responsible for providing complete applicant information, including birth dates, for that process.

55. For many years, the City Clerks sent rush batch requests for background checks to Oertel days before license-approval meetings and pressured her to get them done in time for the meetings. In many cases, the City Clerks could have requested the background checks with more lead time. Oertel acted diligently on the rush requests and when she discovered a missing birthdate, she requested it, but the City Clerks often would not respond or provide a birthdate.

56. Oertel repeatedly raised the failure of the City Clerk's staff to provide birth dates with Coolidge in both email and telephone communication.

57. For example, on May 23, 2018, Oertel sent an email to Coolidge and Marie Wilkinson in the City's Finance Department, stating: "Just a reminder that I need birthdays in the license requests. There's been many without them and I want to make sure the records are accurate." In response, Coolidge sent an email to her team, instructing: "Please be sure you are including the birthday's [sic] in munis as the PD needs this to process the record check. If you have any questions or are unsure where to put the birthday please let me know and I will help."

58. On May 7, 2020, Oertel sent an email to Coolidge stating, "Just an FYI – the backgrounds I'm running I hope are accurate. There are no birthdays in most of the names so I'm using the generic 01/01/1900." Coolidge sent Oertel a response email on May 8, 2020, stating, "Thanks for the heads up. I will remind staff to try [sic] have the birth dates before putting into munis."

59. In a written statement Coolidge provided on July 8, 2020 as part of the City's investigation while Oertel was on medical leave, Coolidge admitted that "[t]here were many occasions throughout [her] time in [sic] clerk's office where birthdates had been missing from applications."

60. In her written statement, Coolidge also admitted that she "remember[s] having phone conversations with Margaret Oertel in reference to birthdates being missing from record check workflows."

61. Coolidge also admitted to Jones – as documented in a June 11, 2020 memo that Jones addressed to the Human Resources Department – a that the Clerks used the generic birthdate of 01/01/1900 in the license application process.

62. Coolidge and her team of clerks were not fulfilling their job responsibilities by accepting applications that were missing birthdates, requesting background checks without the

required birthdates, and presenting the applications without accurate birthdates to City officials for approval.

63. Jones agreed it was the responsibility of the City Clerk's Office to provide applicant birthdates, not the responsibility of the Racine Police Department. In an email she sent to Oertel on May 20, 2020, Jones states: "I spoke to Mark [Deputy Chief Mark Schulz] to let him know I am going to call Tara and let her know we cannot use the generic B-day for these record checks. If you have any other request without [sic] DOB do not run it under 01/01/1900. They must provide a birthdate before it can be ran [sic]; we also will not be relying on Phoenix for this information because we still do not know if it is accurate. This is too much of a liability and we will need the DOB before running the background check."

64. Jones was aware since at least 2018 that Oertel was not given accurate birthdates by the City Clerks and was having to use a generic date to process their requests within the short deadlines Clerks gave her. Jones never instructed Oertel not to run a background check request without an accurate birthdate; nor did she take any other action to address the matter.

65. For example, in May 2018, when the City started using a new system (Munis), Jones asked Oertel to show her how she ran background check reports in the event of Oertel's absence. Oertel told Jones that Coolidge directed Oertel to use a "generic" birthdate if Coolidge or her team did not supply the applicant's actual birthdate (by that time the Department of Justice's system required that a birthdate be entered to run a background check report). Jones did not raise a question or concern about using a "generic" date at that time.

66. In or around March or April 2020, Oertel again notified Jones that the City Clerk's Office was not consistently and timely providing license applicants' birthdates, leaving Oertel with

11

the only option of inputting a "generic" birthdate to fulfill the City Clerk's background check requests.

67. Jones never directed Ms. Oertel not to use a generic date in running a background check report requested by the City Clerks or otherwise refuse the City Clerks' requests.

68. To Oertel's knowledge, Racine took no action against Coolidge or her staff for their repeated performance failures, including failing to obtain license applications with birthdates, to request background checks without providing the Police Department an accurate birthdate, and for presenting license applications for approval with incomplete information and based on possibly inaccurate background check information.

69. Coolidge remains in her position as Racine's City Clerk and Treasury Manager.

70. Oertel was not interviewed or given an opportunity to respond to the birthdate issue before receiving Croteau's August 20 termination letter. The termination decision was made without Oertel's input or explanation.

71. Croteau's August 20 termination letter states that Oertel "will have until noon on Friday, September 4, 2020 to submit to this office in writing, any matters in defense, extenuation, or mitigation as to why the City should not carry out its intended action."

72. On September 4, 2020, Oertel's legal counsel submitted a response to Croteau's August 20, 2020 letter which, among other things, pointed out flaws in Racine's investigation and findings as to the use of generic birthdates. The response also pointed out additional records that Racine should review and consider as part of a full and fair investigation, including the City Clerk's license application records (showing missing birthdates), emails between Oertel and the City Clerk staff concerning background check requests and reports, and the reports themselves. Racine never reviewed such additional records or questioned Oertel for more information.

73. On October 26, 2020, more than seven weeks after submitting her response, Oertel received a letter from Croteau notifying Oertel that her "employment relationship with the City of Racine ('City') Police Department ('RPD') will be hereby terminated on November 1, 2020 for the reasons set forth in the letter dated August 20, 2020, a copy of which is enclosed."

74. Racine did not restore Oertel to her position or to an equivalent position after Oertel's approved FMLA leave ended and she was released by her doctor to return to work.

75. Racine offered phony reasons for terminating Oertel's employment on May 28, 2020, on August 20, 2020, and on October 26, 2020 as a cover-up for a discriminatory and retaliatory motive.

76. Racine knowingly and deliberately placed Oertel on an overly broad and vague PIP to manufacture a reason to fire her.

77. Racine instigated sham investigations of Oertel's job performance to manufacture a reason to fire her.

78. Racine knowingly and intentionally failed to conduct a fair and complete investigation of Oertel's use of a generic birthdate to generate requested background check reports to manufacture a reason to fire her.

79. Racine knowingly and intentionally treated Oertel less favorably than similarly situated employees because of her use of FMLA leave, her disability, and her complaint of discrimination and Racine's failure to comply with the FMLA and ADA.

80. Racine's decisions to fire Oertel were unlawful.

## FIRST CAUSE OF ACTION
### (Interference with FMLA Rights)

81. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation ineach of the preceding paragraphs as if fully set forth herein.

82. At all relevant times, Plaintiff was an "eligible employee" within the meaning of the FMLA, and Defendant was and is a covered "employer" within the meaning of the FMLA.

83. During the relevant time period, Plaintiff had a "serious health condition" as defined by the FMLA for which she was entitled to, and approved to take, medical leave.

84. By the acts and practices described above, Defendant violated the FMLA, 29 U.S.C. § 2614(a), by failing to restore Oertel to her position or to an equivalent position following her approved medical leave in August 2020, which constitutes interference with Oertel's rights under the FMLA, 29 U.S.C. § 2615(a)(1).

85. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer monetary and other economic harm for which she is entitled to an award of damages, in addition to reasonable attorney's fees and costs.

86. Defendant's unlawful and discriminatory actions were willful, wanton, and malicious and showed reckless disregard for Plaintiff's statutorily protected rights, warranting liquidated damages.

## SECOND CAUSE OF ACTION
### (Discrimination in Violation of the FMLA)

87. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

88. At all relevant times, Plaintiff was an "eligible employee" within the meaning of the FMLA, and Defendant was and is a covered "employer" within the meaning of the FMLA.

89. During the relevant time period, Plaintiff had a "serious health condition" as defined by the FMLA for which she was entitled to, and approved to take, job-protected medical leave.

90. By the acts and practices described above, Defendant discriminated against Oertel by terminating her employment for asserting her rights under the FMLA in violation of the FMLA, 29 U.S.C. § 2615(a)(2).

91. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer monetary and other economic harm for which she is entitled to an award of damages, in addition to reasonable attorney's fees and costs.

92. Defendant's unlawful and discriminatory actions were willful, wanton, and malicious and showed reckless disregard for Plaintiff's statutorily protected rights, warranting liquidated damages.

## THIRD CAUSE OF ACTION
### (Discrimination in Violation of the ADA)

93. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

94. During the relevant time period, Plaintiff had a "disability" as defined by the ADA for which she was entitled to reasonable job accommodation.

95. By the acts described above, Defendants discriminated against Plaintiff by terminating her employment on the basis of her disability in violation of the ADA.

96. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer monetary and other economic harm for which she is entitled to an award of damages, in addition to reasonable attorney's fees and costs.

97. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

98. Defendant's unlawful and discriminatory actions constitute malicious, willful, and wanton violations of the ADA, warranting punitive damages.

## FOURTH CAUSE OF ACTION
**(Retaliation in Violation of the ADA)**

99. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

100. Defendant retaliated against Plaintiff by terminating her employment for her complaint of discrimination based on her disability and denial of job accommodation in violation of the ADA.

101. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer monetary and other economic harm for which she is entitled to an award of damages, in addition to reasonable attorney's fees and costs.

102. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

103. Defendant's unlawful and retaliatory actions constitute malicious, willful, and wanton violations of the ADA, warranting punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, through the following relief:

A. A declaratory judgment that the actions of Defendants complained of herein violate the laws of the United States;

B. An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and other economic damages, including but not limited to lost income and benefits;

D. An award of damages in an amount to be determined at trial, plus prejudgment interests, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

E. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and compensatory damages, including but not limited to, emotional pain and suffering and emotional distress;

F. An award of punitive damages in an amount to be determined at trial;

G. An award of liquidated damages in an amount to be determined at trial;

H. An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and

I. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: June 23, 2021          Respectfully submitted,

**LINDNER LAW, LLC**

By: _s/Laura A. Lindner_
    Laura A. Lindner

State Bar No. 1021506
648 N. Plankinton Ave. – Suite 418
Milwaukee, WI 53203
(414) 409-1242
laura@lindnerlawllc.com

*Attorneys for Plaintiff*